IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOHN K. F.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 18-cv-2113-DGW[2] |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM and ORDER

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB and SSI in June 2014. (Tr. 18). After the agency's final denial, he sought judicial review. The case was remanded to the Commissioner by agreement of the parties. (Tr. 649). Plaintiff alleged a disability onset date of June 24, 2014. The same ALJ then held a second evidentiary hearing and denied the application on August 29, 2018. (Tr. 564-579). The August 2018 is the final agency decision subject to judicial review. Plaintiff exhausted his administrative remedies and filed a timely complaint with this Court.

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 11, 21.

1

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

1. The final agency decision is the product of reversible errors of law and is not supported by substantial evidence. This Court should find plaintiff disabled as a matter of law because of uncontradicted evidence of absence from work due to four to five gout flare ups annually, each of which requires absence of at least a week.

2. The final agency decision is not supported by substantial evidence and is the product of reversible errors of law because the residual functional capacity for sedentary work is not supported by the record.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. 20 C.F.R. § 416.925, detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The plaintiff bears the burden of proof at steps 1–4. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court's definition of substantial evidence applies, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However,

while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had not worked since the alleged onset date. Plaintiff was insured for DIB through December 31, 2018.

The ALJ found that plaintiff had severe impairments of gout/inflammatory arthritis, right foot osteoarthritis, degenerative disc disease of the lumbar spine, obesity, history of alcohol abuse in remission, history of learning disorder, adjustment disorder with depressed mood, anxiety, and depression, which did not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to do work at the sedentary exertional level with a number of physical and mental limitations. As is relevant here, he was limited to standing and/or walking for a total of two hours per workday.

Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past relevant work. However, he was not disabled because he was able to do other jobs that exist in significant numbers in the national economy.

### **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record

is directed to the points raised by plaintiff. Plaintiff's arguments relate only to the effects of his gout.

1. **Agency Forms**

Plaintiff was born in 1973 and was 45 years old on the date of the ALJ's decision. (Tr. 237).

In June 2014, plaintiff said he was let go from his last job in November 2013 because he missed too much work due to gout flare-ups. He said he could not walk when he had a gout flare-up. He had worked as a material handler in a factory and as a mixer in a factory. (Tr. 241-242). In October 2014, he reported that he could not walk or put on shoes or socks when he had a gout attack. (Tr. 312).

2. **Evidentiary Hearing**

Plaintiff was represented at the hearing in August 2018. (Tr. 591).

Plaintiff testified that his gout attacks usually started out in the left foot and moved to his right foot and sometimes to other places like his wrist and knees. His last attack was about two months earlier. The attacks last from a week and a half to three weeks. During an attack, about the only thing he could do was sit in a chair with ice on his feet. He could hardly walk and had to crawl to the bathroom. He had at least four gout attacks in the past year. (Tr. 599-600). He said he had back pain also. (Tr. 601). He lived with his parents and spent his days laying in his room. He did not really do anything. (Tr. 602-603).

A vocational expert (VE) also testified. The ALJ asked him a hypothetical question ("Hypothetical No. 2") which corresponded to the written RFC assessment.

5

The VE testified that this person could do jobs such as assembler, document preparer, and pari-mutuel ticket taker. If he were to be absent more than six to nine days a year, he would be unemployable. (Tr. 611-615).

### 3. Relevant Medical Records

Plaintiff was seen in the emergency room for gout in June 2014. He had pain in his right ankle and foot. (Tr. 357). He followed up with Carterville Family Practice Center in July 2014. He reported that he had gout attacks about twice a year and had been having these attacks since he was about 25 years old. He said he was prescribed a steroid in the emergency room and his pain had resolved. He said his gout moved around in his feet and ankles. He was 6 feet tall and weighed 316 pounds. Physical exam was normal. (Tr. 429-431). After lab work, he was started on Allopurinol for gout.[4] (Tr. 427). In October, he presented with a flare-up of gout in his left big toe. On exam, there was slight swelling in the first MPJ joint on the left and it was "very tender to touch." The plan was to see if his insurance would cover Colcrys, another gout medication, because "he is in the ER every other week and I think thus will keep him out of the ER." He was also prescribed Medrol. (Tr. 421-423). The next month, plaintiff reported he was allergic to Colcrys. He was still taking Allopurinol but was still having attacks and his insurance was not paying for it. The doctor gave him samples of Uloric.[5] (Tr. 418-420).

---

[4] Allopurinol is used to reduce the production of uric acid in the body. https://www.drugs.com/allopurinol.html, visited on July 9, 2019.
[5] "Uloric is used to keep uric acid levels from getting to high in people with gout. Uloric is for use only in people who cannot take another medicine called allopurinol, or when allopurinol has stopped working." https://www.drugs.com/uloric.html, visited on July 9, 2019.

In December 2014, x-rays showed findings in the left foot consistent with gout. The right foot had mild osteoarthritis of the first MTP joint, but no "radiographic findings of gout." (Tr. 455,457).

Lab work showed plaintiff's uric acid at 6.1mg/dL in February 2015. The "therapeutic target for gout patients: <6.0 mg/dL." (Tr. 516).

Dr. Nekzad at Carterville Family Practice noted in April 2015 that plaintiff was doing well and had not had a gout attack "for a while." (Tr. 482). However, in mid-May, he presented with a "very tender" left wrist which plaintiff attributed to gout. He said he was taking Uloric regularly. He was prescribed Prednisone. (Tr. 478-481).

In January 2016, plaintiff's uric acid level was 9.5 mg/dL. It was 7.9 mg/dL in April 2016. (Tr. 512-513).

Plaintiff went to the emergency room for left knee pain which he attributed to gout in August 2016. On exam, his gait was normal, and he ambulated independently but he had tenderness in the anterior left knee. His uric acid level was 9.5 mg/dL. The impression was arthritis. (Tr. 908-915). An x-ray of the left knee showed anterior soft tissue swelling. (Tr. 993).

In September 2016, Dr. Emily Hanson began treating plaintiff as his primary care physician. He complained of gout and back pain. He said he was trying to get disability and he "does not know how he can work because he has always done 'factory work' and when he is on his feet will get gout flares." He complained of aching pain in his right knee from gout. On exam, his weight was 312 pounds. His gait was normal. Muscle strength was normal. He was prescribed Uloric for

7

gout. (Tr. 951-953). His uric acid level was 5.0 mg/dL. (Tr. 898).

In January 2017, plaintiff told Dr. Hanson he had two gout attacks since his last visit. His gait was normal. He was prescribed medication for back pain and was to continue taking Uloric for gout. (Tr. 957-958). Plaintiff was seen for a three-month medication check in May 2017. He said that he had a gout attack at least once a month and if he spent a lot of time on his feet, it triggered an attack. Physical exam was normal, including his gait. (Tr. 960-962).

An x-ray of the left ankle in August 2017 showed soft tissue swelling greatest over the lateral aspect of the ankle. (Tr. 994).

Plaintiff was seen by a physician's assistant in Dr. Hanson's office in October 2017 for a flare up of gout in his left foot, ankle and knee. He said it had lasted for three weeks. On exam, he had tenderness and decreased range of motion of the left knee and left foot, and decreased range of motion and swelling in the left ankle. The assessment was gout. He was prescribed Medrol and Norco. (Tr. 979-980). Lab work in October 2017 showed his uric acid was at 5.3 mg/dL. (Tr. 986).

Dr. Hanson saw plaintiff in November 2017. On exam, he had a normal range of motion and no swelling or tenderness. (Tr. 1018-1020).

Dr. Jarugula, a rheumatologist, saw plaintiff in December 2017. On exam, he had no significant swelling or tenderness in the knees and an appropriate range of motion. In the feet, he had pain bilaterally with flexion of the first MTP joint. He had tenderness across the MTPs, especially the first through the fourth digits. There was no swelling and he had an appropriate range of motion. Dr. Jarugula's impression was "His history of sudden onset pain, swelling and redness with

sudden [sic] in his both [sic] big toes, and occasionally in the knees and wrists is certainly concerning for crystalline arthritis such as gout. Patient is a poor historian and felt like his hip pain was also related to gout. Explained to him most likely secondary to underlying degenerative arthritis in his back. No acute flare-up at this time and [n]o evidence of joint inflammation on exam today." His uric acid had been 5.3 in October 2017, but she noted that was taken in the setting of a flare-up, and the levels "can sometimes be falsely low during the flare-up." She ordered another uric acid level and recommended that he come in during an acute flare-up and she would consider aspiration of the moderate to large joints to help with diagnosis. (Tr. 1020-1026).

In December 2017, his uric acid level was in the normal range at 3.9. (Tr. 1028).

Dr. Raymond Leung examined plaintiff at the request of the agency in April 2018. Among other problems, plaintiff said he had up to five gout attacks a year which affected his knees and feet, and they lasted from one to three weeks. He said he was not taking medication for gout "as his insurance does not pay for this." Plaintiff "did not bring a cane to the exam." His weight was 321 pounds. He walked with a mild limp but was able to walk 50 feet unassisted. He could tandem walk, hop, and heel walk, but not toe walk. He was able to squat. He had full arm, leg, pinch and grip strength. There was no muscle atrophy. There was some limitation of movement of the lumbar spine and the knees. Range of motion of the ankles was full. (Tr. 998-1003). In his RFC assessment, Dr. Leung said that plaintiff was capable of standing for a total of four hours a day and walking for

9

a total of two hours a day. (Tr. 1005).

   4.   **Treating Doctor's Opinion**

Dr. Hanson assessed plaintiff's RFC in May 2018. She said treated him for gout, degenerative disc disease, and hypertension. She said that he had daily pain and stiffness in the low back and "frequent, random episodes of pain & swelling of joints in hands & feet." She said that he could stand/walk for a total of less than two hours a day and that he "may need to [use a cane] at times." Among other limitations, she said that plaintiff was limited to only reaching, handling, and fingering for 25% of the workday. She estimated that he would be absent from work more than four days per month. (Tr. 1038-1041).

## **Analysis**

Both of plaintiff's points concern the alleged limiting effects of his gout. The second point is just a reiteration of the first.

Plaintiff argues that the uncontroverted evidence demonstrates that he is unable to stand/walk for a total of two hours a day on a regular basis because of gout attacks. As he puts it, "The uncontradicted evidence is that [plaintiff] has anywhere from four to six gout flare ups annually that are so severe as to take him out for at least one week and sometimes well into a second week." Doc. 17, p. 4. Plaintiff goes so far as to assert "Remand for payment of benefits is the only remedy that can be sustained on this record." Doc. 17, p. 10. This argument misstates the medical evidence and ignores the stated basis of the ALJ's decision.

It is true that the ALJ noted that plaintiff made "variable reports" as to the frequency of his gout attacks and found that "the record overall indicated about 4 –

6 times a year." (Tr. 573). It is incorrect, however, to say the "uncontradicted evidence" establishes that his gout attacks are "so severe as to take him out for at least one week and sometimes well into a second week." In fact, the ALJ found the opposite.

Th ALJ explicitly rejected plaintiff's contention that he is unable to work at all during a gout attack. Plaintiff conveniently ignores the ALJ's conclusion that "While the medical evidence shows symptoms of tenderness and swelling during the gout attacks, there is no evidence beyond the claimant's subjective reports as to the duration of severely limiting symptoms." (Tr. 576). The ALJ found that plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms are not consistent with the medical and other evidence. (Tr. 575). Plaintiff has not challenged that finding.

The ALJ explained why he concluded that the medical evidence did not support plaintiff's claim. (Tr. 570-572). He also noted that there is no mention in the treatment notes of the need for an ambulation device, that the most recent exam in 2017 showed only some bilateral foot and ankle tenderness, that Dr. Leung found he had no muscle atrophy, and that plaintiff's uric acid levels have been normal in 2017. (Tr. 576). Plaintiff's argument does not engage with any of this reasoning.

Plaintiff mentions the medical opinions at Doc. 17, p. 8-9. He says that the consultative examiner, Dr. Leung, noted that plaintiff occasionally uses a cane. Of course, Dr. Leung was merely relying on plaintiff's statement that he sometimes used a cane. Dr. Leung noted that plaintiff was not using a cane on the day of the

11

exam. Plaintiff notes that the ALJ gave "significant weight" to Dr. Leung's opinion, but he offers no specific argument why that was erroneous. Similarly, plaintiff notes that the ALJ gave only "little weight" to Dr. Hanson's opinion. The ALJ was not required to credit her opinion because of her status as a treating doctor. *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); 20 C.F.R. § 404.1527(c)(2). Plaintiff offers no specific argument why the weighing of Dr. Hanson's opinion was erroneous. He again cites the ALJ's finding that plaintiff suffered from gout flare-ups but ignores the ALJ's conclusion about the severity of symptoms during those attacks.

Plaintiff offers a confusing critique of the hypothetical questions posed to the VE at Doc. 7, pp. 4-6. He argues that the ALJ erred in failing to include a limitation that plaintiff could "ambulate fifty feet" as found by the examining doctor in 2014 before the first ALJ decision was remanded. Plaintiff finds it "important" that the 2014 opinion was given "greater weight" in the first decision but was not weighed at all in the 2018 decision. It is unclear why this is important, since the ALJ did weight Dr. Leung's later report. Further, both examiners found that plaintiff was able to ambulate for fifty feet. Plaintiff argues that it was error as a matter of law not to include a limitation that plaintiff could ambulate fifty feet, but that is clearly not so. First, the determination of RFC is an administrative finding that is reserved to the Commissioner. 20 C.F.R. §404.1527(d)(2). The ALJ "is not required to rely entirely on a particular physician's opinion or choose between the opinions. . . ." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). Regardless, neither examiner found that plaintiff could ambulate fifty feet at the *most*. The

ALJ limited plaintiff to a total of walking/standing for two hours total a day, not walking/standing for two hours at a time.

Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Burmester,* 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). Plaintiff's argument simply assumes that a gout attack makes him unable to walk. He does not advance any compelling argument why the ALJ's conclusion to the contrary was erroneous.

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:** July 12, 2019.

*Donald Wilkerson*

**DONALD G. WILKERSON**
**U.S. MAGISTRATE JUDGE**